*5 9 n. w. 904*

## DANIEL F. LA BONTY v. CARL P. LUNDGREN.

FILED JUNE 26, 1894. No. 5974.

**Trial:** EJECTMENT: GENUINENESS OF SIGNATURES TO DEEDS: CON-
SIDERATION BY JURY IN JURY ROOM OF NOTE NOT IN EVIDENCE.
In a case in ejectment, where the signatures to certain deeds pur-
porting to convey the land in controversy are in dispute, and a note
obviously signed by the alleged forger of the said deeds, and not
admitted and read in evidence, is allowed, accidentally or other-
wise, to be taken into the jury room, remaining in the hands of
the jury during their consideration of the verdict, it is fair to
assume, unless definitely demonstrated to the contrary, that such
note with its signature were considered and examined by the
jury; and its admission to the jury room was prejudicial to the
party against whom the verdict was rendered, and calls for a re-
versal of the verdict and a new trial of the cause.

ERROR from the district court of Cuming county. Tried below before NORRIS, J.

*Griggs, Rinaker & Bibb, J. C. Crawford,* and *J. A. Smith,* for plaintiff in error:

When the jury retired they took with them into the jury room without plaintiff's consent, a note which had not been introduced in evidence. This was shown by affidavit to be prejudicial to plaintiff. The court erred in refusing a new trial for misconduct of the jury. (*State v. Hartmann,* 46 Wis., 248; Proffatt, Jury Trials, secs. 392, 405; *Town of Peacham v. Carter,* 21 Vt., 515; *Kruidenier v. Shields,* 77 Ia., 504.)

*Munger & Courtright, T. M. Franse,* and *M. McLaugh-lin, contra.*

La Bonty v. Lundgren.

HARRISON, J.

This is an action of ejectment commenced by Daniel F. La Bonty to recover the possession of 160 acres of land, the northeast quarter of section 26, in township 21 north, of range 7 east, and in Cuming county, Nebraska. The petition is in the usual form. The answer is a denial of the allegations of the plaintiff's petition, and further pleads as a defense that defendant purchased the lands in controversy from one John Kerkow during the year 1881, and received a warranty deed therefor, paying the sum of $1,000 as the consideration for said sale; that he made the purchase in good faith, and without any knowledge or notice of any claim or interest of the plaintiff to or in the land; and further recites the valuable improvements which he has placed upon and attached to the land. The plaintiff, in reply, denied the affirmative statements and allegations of new matter in the answer. A trial of the issues was had before the court and a jury, the outcome of which was a verdict in favor of the defendant. The plaintiff filed a motion for a new trial, which the court overruled, and judgment was rendered for defendant upon and in accordance with the verdict. A reversal of this judgment is sought by the plaintiff in these proceedings in error to this court.

The paper claim of title introduced in evidence by the plaintiff to sustain his contention was a certificate of location issued by the United States through one of its land offices October 10, 1867, to Charles Bartholomew, which was assigned to Daniel F. La Bonty; a patent issued November 2, 1868. Defendant on his part introduced a deed of date December 2, 1880, purporting to have been signed by D. F. La Bounte or "D. F. Lq Bounte," the grantee named therein being John Kerkow. He also introduced a tax deed by the treasurer of Cuming county, in favor of L. B. Baker, as grantee,

also a quitclaim deed from Baker to D. F. La Bonte, this last of date December 11, 1880, and a quitclaim deed of date January 27, 1881, to John Kerkow, purporting to to have been signed by D. F. La Bonte, also a deed from John Kerkow and wife to defendant December 15, 1880. It will be noticed, in mentioning the deeds from La Bonte to John Kerkow, it has been stated that they purported to have been signed by D. F. La Bonte. They are thus alluded to for the reason that on the question of whether the signatures to them were written by Daniel F. La Bonty, or were forgeries, hinged or turned the decision of the case by the jury, the fact of the genuineness, or lack of it, of the signatures being the main point in the case to which the evidence was directed and with reference to which there was a sharp and well defined conflict in the testimony, and upon which there was a hot contest throughout the whole trial. A number of the witnesses for the plaintiff, among whom was the notary before whom the two deeds referred to were acknowledged, and the attesting witnesses to one of them, testified that the signatures to the deeds were written by one Amos Labonte, or as he was otherwise known and familiarly called, "Frenchy." Six copies of pension vouchers and two chattel mortgages which had been signed by this man Amos Labounte were introduced by the defendant to prove, by comparison with the signatures upon the two deeds, that he did not write the signatures last mentioned, and among other things attention was particularly drawn to the fact that Amos Labonte, or "Labuntey," as he says it should be spelled, never separated the name into two parts nor spelled the Bonte part of it commencing with a capital "B," as was done in both instances in the signatures to the deeds, which are the subject of plaintiff's attack as forgeries, but that he invariably wrote it in one word, "Labuntey," and used a small "b." In his testimony he states:

Q. That kind of a "D" you don't know how to make?

A. No, or any kind of a "D."

Q. Or a "B."

A. No, I never tried to make a "B." I simply sign my name the way I sign it here. (Here the witness marks with his hand on the desk.)

Q. How do you write your name, as far as the "B" is concerned?

A. I write just a small "b."

Q. Nothing like the "B" that is on those deeds?

A. No, sir.

And one William H. Stanley, a witness for the plaintiff, in his testimony says:

Q. Will you state whether he signed the name with a small "b" or a large "B" in the word "bountey."

A. I think it was with a large "B," that is my recollection of it.

Q. Will you be positive of that?

A. No, I will not be positive.

Q. Can you produce a signature of Amos Labountey, wherein he wrote the name with a capital "B" in the word "Bountey."

A. I think so. I know I can produce his signature, if I have little time to look it up, but I am not positive as to the capital "B."

The defense seem to have made quite an effort to convince the jury that no signature could be produced, made by Amos Labuntey, where the separation in the word was made and the capital "B" used; that he could write nothing but his name, and this only in the one manner indicated, stated in his testimony, and as shown by the exhibits introduced. In the brief of counsel for the intervenor, W. H. Atwood, who is now defendant in error, we find the following on this same subject: "The 'B' in every case is a capital 'B' and not unlike those made by plaintiff, whereas the signatures, as shown by the photograph, are in no particular like the signatures of Amos Labounte.   *   *   *   Plaintiff

has been challenged to show a signature of Amos Labounty, signed with a capital 'B,' or a word written by him, other than his signature.  *  *  *  Amos Labunty cannot write and never does write anything except his own name, and never writes that in any other manner than with a small 'b'." From all this it will be gathered that the signature of Amos Labunty, and the manner in which it was framed, and whether a capital "B" or a small "b" was used and appeared in it wherever and whenever it was seen, was one of the important facts to be determined by the jury from the evidence adduced.

One of the errors assigned and argued by plaintiff is thus stated in the motion for a new trial: "The jury obtained and took with them into the jury room, by some means unknown to the plaintiff and without his knowledge or consent, a certain promissory note, which had not been introduced in evidence by either party, purporting to have been executed by Amos Labounty to Van Devort & Co. for the sum of $45, dated February 13, 1890, which said note, and especially the signature thereto, was considered and discussed by the jury, as will more fully appear by the affidavit of Emil Heller and J. A. Smith, with the said note thereto attached, marked Exhibit 'A' and made a part hereof." The affidavits referred to are as follows:

"Emil Heller, being first duly sworn, says that he is clerk of the district court of Cuming county; that the above cause was submitted to the jury February 6, 1892; that among the papers returned with the verdict of said jury was the note signed by Amos Labounty, which said note is attached to this affidavit and made a part hereof and marked Exhibit 'A'."

"J. A. Smith, being first duly sworn, says that he is of counsel of plaintiff; that the above cause was submitted to the jury February 6, 1892; that the note referred to in the affidavit of Emil Heller, and made a part of his affidavit, was not introduced in evidence and was not, with the con-

La Bonty v. Lundgren.

sent of plaintiff or his counsel, given them.   The said jury
being called for an explanation of the occurrence upon
February 8, 1892, in open court, each and every one said
they knew nothing as to the manner of how the said note
came into their deliberations; that during the time said
jury was out and deliberating upon the verdict, said jury
instructed the bailiff to ask the court for the depositions of
D. F. La Bonty and Amos Labounty, also the two deeds
introduced in evidence; that the court, upon the refusal of
attorneys for defendant to consent to the request of the
jury, refused the same; that this affidavit and also that of
the clerk of the district court of Cuming county is made
by each of them for the sole reason that many of the jurors
in said cause, having been asked to make the same, ex-
pressed a reluctance and decided disinclination to make the
same."

The plaintiff very strenuously contends that for this the
case should be reversed and remanded for a new trial.
The note attached to one of the above affidavits was not
introduced or offered as evidence in the case, so far as the
record discloses.   It had not been identified in any manner
as a note signed by Amos Labuntey, or made competent as
evidence.   In truth its first appearance in the case, accord-
ing to the record, was when it was handed to the clerk by
the jury, along with the verdict; and no blame, it seems,
can attach to any one for the jury having it in their pos-
session; but from the facts that the controversy over the
manner in which this name was written, and the compari-
son with the two deeds in question, was so strong, and the
evidence so conflicting, and to be determined by the jury
from a view and consideration of all the evidence bearing
upon it; that there were but few papers sent out at the time
they retired to consider of their verdict; that after being out
a short time they sent for all the other papers upon which
the disputed signature appeared, and also those introduced,
by which it was sought to help them in reaching a conclu-

sion as to whether the two deeds had been signed by the plaintiff, or some one else who was not authorized by him to do so; that when the jurors were interrogated afterward in open court, in regard to the note and the manner of their obtaining possession of it, they all showed a knowledge of it, but could give no account of how they became possessed of it,—it is fair to conclude that it was used by them and entered into their deliberations as a part of the evidence, from which the conclusion was reached, which became their verdict, determining the rights of the parties to the action. The only further question is, does this call for a reversal of the case?

In 2 Thompson, Trials, p. 1943, sec. 2580, it is said: "The general rule is that if depositions or other papers which have not been admitted in evidence are taken out by the jury when they retire to consider of their verdict, a new trial will be granted; since it would be idle to rule out incompetent documentary evidence, if the jury were allowed to take it to their room and consider it while making up their verdict."

In *Neil v. Abel*, 24 Wend. [N. Y.], 185, it is said: "Where a cause was tried in a justice's court, and the justice, at the request of the jury, after they had retired to consider of their verdict, gave them, without the consent of the parties, his minutes of the trial, the common pleas, on *certiorari*, reversed the judgment rendered on the verdict of the jury, and this court, on writ of error, affirmed the judgment of the common pleas."

In Thompson & Merriam on Juries, p. 481, sec. 386, it is said: "The general rule is, that if depositions or other papers which have not been admitted in evidence are taken out by the jury when they retire to consider of their verdict, a new trial will be granted. This rule rests upon the same reason which makes it error to admit hearsay or other incompetent evidence at the trial. It would be idle to rule out incompetent documentary evidence if the jury

were allowed to take it to their room and consider it while making up their verdict."

In *Munde v. Lambie*, 125 Mass., 367, it was held: "If a bill of exceptions, allowed by the judge at the first trial of a case, and containing statements material to the issue, is at the second trial taken to the jury room and read by the jury, or any of them, it is sufficient ground for a new trial; and misconduct by the party in whose favor the verdict is rendered need not be shown;" and Gray, C. J., in the text of the opinion says: "The bill of exceptions tendered by the plaintiff and allowed by the judge at the first trial, was not competent evidence to be laid before the jury at the second trial. As the statements therein were material to the issue and may have prejudiced the defendants, it was not necessary to show misconduct on the part of the plaintiff in bringing the paper before the jury."

So in *Hix v. Drury*, 5 Pick. [Mass.], 296, it was said: "Where a paper, which is capable of influencing the jury on the side of the prevailing party, goes to the jury by accident, and is read by them, the verdict will be set aside, although the jury may think that they were not influenced by such paper, for it is impossible for them to say what effect it may have had on their minds."

In *Whitney v. Whitman*, 5 Mass., 405, we find that "where, upon a trial, a material paper, not read in evidence, had been given to the jury by mistake, a new trial was granted without costs," and in the body of the opinion it is stated: "The court refused to examine any of the jurors, and observed that the court must be governed by the tendency of the paper apparent from the face of it; that it was not pretended that the jury had not read it, and it would be difficult for jurors, where, as in this case, there was much evidence of different kinds, clearly to decide in what manner their minds were influenced in forming their verdict. As it was received by the jury among other written evidence and read by them, it must be presumed

La Bonty v. Lundgren.

that they considered it as evidence, and gave due weight to it."

In *Woodbury v. City of Anoka*, 54 N. W. Rep. [Minn.], 187, it was held: "Where there is misconduct of jurors that may have had an influence on the verdict unfavorable to the defeated party, the verdict must be set aside, unless it appear, beyond doubt, that in fact it had no such effect;" and we quote from the text as follows: "Misconduct of jurors as a reason for setting aside the verdict was fully considered in *Koehler v. Cleary*, 23 Minn., 325, and the rule stated that 'if it does not appear that the misconduct was occasioned by the prevailing party, or any one in his behalf, and if it does not indicate any improper bias in the jurors' minds, and the court cannot see that it either had or might have had an effect unfavorable to the party moving for a new trial, the verdict ought not to be set aside,' and that all the moving party can be called on to show is 'that the misconduct may have had an effect unfavorable to him.' The party need not show that he was in fact prejudiced. That case concedes that where the misconduct may have had an effect unfavorable to the defeated party, the other party may be permitted to show that in fact it did not have such effect. But that would have to appear very clearly,—so clearly as to leave no doubt as to the fact. When it may have had an unfavorable effect, it would be unsafe to allow any speculation, whether in fact it did or not." (See, also, *Durfee v. Eveland*, 8 Barb. [N. Y.], 46; *Thrall v. Smiley*, 9 Cal., 529; *McLeod v. Humeston & S. R. Co.*, 32 N. W. Rep. [Ia.], 246; *Bulen v. Granger*, 29 N. W. Rep. [Mich.], 718.)

The signature upon the note which the jury had with them in their room was as follows:

and if not the genuine signature of the witness, Amos

Labuntey, was a very clever imitation of it; but however this may be it seems highly probable, if not entirely certain, that it must have exerted an influence on the minds of the jurors very unfavorable to the plaintiff's contention in the case, on the branch of the inquiry of the case on trial, in reference to the signatures, and as this was largely a governing one, it seems more than probable that it must have been prejudicial to his rights. It is the policy of the law to guard very jealously and carefully the deliberations of juries, and keep them·free from any influence from sources other than the court, and through the channels provided by its rules and laws.

There are several errors assigned and argued, but as their discussion would involve and necessitate more or less comment upon the evidence in the case, and its weight and sufficiency, and as there must be another trial, we think it best to stop here, and to refrain from any further consideration of the case.

                    REVERSED AND REMANDED.